IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| INDEPENDENCE BARBERSHOP, LLC, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED;<br>*Plaintiff*<br><br>-vs-<br><br>TWIN CITY FIRE INSURANCE COMPANY,<br>*Defendant* | §§§§§§§§§§ | A-20-CV-00555-JRN |

## ORDER

Before the Court in the above-entitled and styled cause of action are Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. 37), Defendant's Motion to Dismiss First Amended Complaint's Nationwide Class Action Claims (Dkt. 38), and associated response and reply briefs. In the first motion, Defendant moves the Court to dismiss Plaintiff's claims against it on the grounds that Plaintiff's First Amended Complaint has not stated a claim upon which relief can be granted as per the requirements of Rule 12(b)(6). *See generally* (Mot., Dkt. 37); Fed. R. Civ. P. 12(b)(6). In the second motion, Defendant moves the Court to dismiss Plaintiff's class action claims on standing grounds. The Court will address these motions in turn.

### I.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard is not met unless the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Ray v. CitiMortgage, Inc.*, No. A-11-CA-441-SS, 2011 WL 3269326, at *2 (W.D. Tex. July 25, 2011) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)). However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "The plaintiff must establish a cause of action and demonstrate the damages sought are appropriate." *Ray*, 2011 WL 3269326, at *2 (citing *United States v. Stanley*, 483 U.S. 669, 691 n. 7 (1987) (O'Connor, J., concurring)).

Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 545. The "pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *United States ex rel. King v. Univ. of Texas Health Science Center-Houston*, 907 F.Supp.2d 846, 849 (S.D. Tex. 2012).

## II.   DISCUSSION

### a. Background

Plaintiff is a barbershop and grooming supply retailer located in Austin, Texas. Defendant is an insurance company that sold and issued an insurance policy to Plaintiff. On March 31, 2020, in response to the danger posed by the SARS-CoV-2 virus (AKA the "coronavirus"), and COVID-19, the disease caused by the virus, the Governor of Texas, Greg Abbott, issued an executive order forcing the temporary closure of Plaintiff's business. *See* (Am.

Compl., Dkt. 1, at 8). That order remained in place until May 5, 2020, when Governor Abbott issued a subsequent executive order allowing certain services, including barbershops, to reopen. *Id.*

Having suffered this suspension of operations, Plaintiff submitted a claim to Defendant under a clause in the policy covering "direct physical loss of or physical damage" to Plaintiff's place of business. *Id.* at 10. However, Defendant denied the business income loss claim on the grounds that the "coronavirus did not cause property damage at [Plaintiff's] place of business" and "[e]ven if the virus did cause damage, it is excluded from the policy, and the limited coverage available for losses caused by virus does not apply to the facts of [Plaintiff's] loss." (Ex., Dkt. 1-2, at 1).

On May 22, 2020, Plaintiff filed this suit, seeking (a) class certification and designation as Class Representative; (b) damages for breach of contract; (c) declaratory judgment; (d) pre- and post-judgment interest; and (e) attorneys' fees and costs.

### b. The policy

Several clauses in the insurance policy are relevant to the determination of whether the loss suffered by Plaintiff is covered. The most important of these provisions are Form SS 00 07 07 05, called the Special Property Coverage Form,[1] and Form SS 40 93 07 05, officially called

---

[1] In relevant part, the Special Property Coverage Form reads as follows:
**o. Business Income**
**(1)** We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.
…
**(3)** We will only pay for loss of Business Income that occurs within 12 consecutive months after the date of direct physical loss or physical damage.
This Additional Coverage is not subject to the Limits of Insurance.
**(4)** Business Income means the:
**(a)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no direct physical loss or physical damage had occurred; and
**(b)** Continuing normal operating expenses incurred, including payroll.

the "Virus Endorsement," but periodically referred to by the parties as the "Virus Exclusion," which limits the Special Property Coverage Form. [2] *See* (Ex. 1-1, at 38, 128–31).

### c. Virus Endorsement

---

…
**q. Civil Authority**
**(1)** This insurance is extended to apply to the actual loss of Business Income you sustain when access to your "scheduled premises" is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your "scheduled premises".

[2] In relevant part, the virus endorsement reads as follows:
**i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus**
We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:
**(1)** Presence, growth, proliferation, spread or any activity of "fungi", wet rot, dry rot, bacteria or virus.
**(2)** But if "fungi", wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss".
This exclusion does not apply:
**(1)** When "fungi", wet rot, dry rot, bacteria or virus results from fire or lightning; or
**(2)** To the extent that coverage is provided in the Additional Coverage – Limited Coverage for "Fungi", Wet Rot, Dry Rot, Bacteria or Virus with respect to loss or damage by a cause of loss other than fire or lightning.
This exclusion applies whether or not the loss event results in widespread damage or affects a substantial area.
…
**1. Limited Coverage For "Fungi", Wet Rot, Dry Rot, Bacteria and Virus**
**a.** The coverage described in **1.b.** below only applies when the "fungi", wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.
**(1)** A "specified cause of loss" other than fire or lightning;
**(2)** Equipment Breakdown Accident occurs to Equipment Breakdown Property, if Equipment Breakdown applies to the affected premises.
**b.** We will pay for loss or damage by "fungi", wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damage means:
**(1)** Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus;
**(2)** The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet rot, dry rot, bacteria or virus; and
**(3)** The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi", wet rot, dry rot, bacteria or virus are present.
…
[**§ B.1.f.**] The following applies only if a Time Element Coverage applies to the "scheduled premises" and only if the suspension of "operations" satisfies all the terms and conditions of the applicable Time Element Coverage.
**(1)** If the loss which resulted in "fungi", wet or dry rot, bacteria or virus does not in itself necessitate a suspension of "operations", but such suspension is necessary due to loss or damage toproperty caused by "fungi", wet or dry rot, bacteria or virus, then our payment under the Time Element Coverage is limited to the amount of loss and expense sustained in a period of not more than 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive. If a covered suspension of "operations" was caused by loss or damage other than "fungi", wet or dry rot, bacteria or virus, but remediation of "fungi", wet or dry rot, bacteria or virus prolongs the "period of restoration", we will pay for loss and expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days unless another number of days is indicated in the Declarations. The days need not be consecutive.

Defendant contends that the Virus Endorsement constitutes an exclusion of the claimed damages and disposes of all of Plaintiff's claims in this matter. *See* (Reply, Dkt. 44, at 7) ("[The virus exception] is the end of the inquiry."). In response, Plaintiff provides "three primary reasons" that "Defendant's invocation of the purported Virus Exclusion must fail at this early stage of litigation." *See* (Resp., Dkt. 42, at 3). First, Plaintiff argues that the Virus Endorsement is designed to cover something other than the COVID-19 Pandemic. Second, Plaintiff argues that regulatory estoppel precludes the application of the Virus Endorsement to exclude Plaintiff's claims. *Id.* at 4. Third, Plaintiff argues that under the terms of the policy, Plaintiff is entitled to "30-days [sic] of Business Interruption coverage for Limited Virus Coverage." *Id.* The Court will address these arguments in turn.

First, Plaintiff argues that the virus exclusion does not apply to pandemics and would exclude damage related to COVID-19, SARS-CoV-2 and resulting government shutdowns. *See* (Resp., Dkt. 42, at 10). In support of this, Plaintiff asserts that Defendant could "easily" have expressly excluded pandemics from coverage, but it did not do so. Plaintiff also asserts that the term "virus" is grouped with things that are not disease-causing agents, such as "wet rot" and "dry rot," so the exclusion should be understood to exclude the presence or activity of virus that are "akin to rot," which would not incorporate a global pandemic.[3]

Defendant has several responses to these arguments, but the Court need only consider one: the Virus Endorsement excludes losses caused by virus "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *See* (Ex. 1-1, at 128). The

---

[3] After consideration on this subject, the Court is still unclear about what would constitute "virus activity akin to rot." Viruses do not, for example, enter a building's walls when leaks in siding or roofing allow rainwater behind the façade. The Court considered the possibility that Plaintiff was referring to the physical presence of the SARS-CoV-2 virus on the premises and conceding that such presence is what the Virus Endorsement intended to exclude. However, Plaintiff elsewhere argues that the physical presence of the virus would be covered. *See* (Resp., Dkt. 42, at 7) ("…or the actual damage in the form of the likely physical presence of COVID-19 on or within the property.").

Court does not agree with Defendant's conflation of COVID-19 and the "virus." *See* (Mot., Dkt 37, at 8) ("COVID-19 is a 'virus.'"). And in fact the Court might be receptive to the argument that a policy excluding damage caused by a virus might *not* exclude damages caused by having to (a) close one's business to sanitize after learning that someone with a disease caused by a virus came in, or (b) close one's business because of government orders intended to stop the spread of a disease caused by a virus. In other words, the Court might be receptive to arguments that SARS-CoV-2, COVID-19, the COVID-19 Pandemic, and government shutdowns related to the COVID-19 Pandemic are four separate things. But the Court cannot in good faith hold that the SARS-CoV-2 virus is not even a *contributing cause* to these other terms.

Second, Plaintiff argues that regulatory estoppel may apply. *See* (Resp., Dkt. 42, at 12). Plaintiff further argues that the insurance industry may have misled state regulators by representing that the Virus Endorsement was not an exclusion but was instead only a clarification of existing coverage. *Id.* Plaintiff maintains that discovery is needed to determine what was presented to state insurance regulators regarding the endorsement. However, the Court agrees with Defendant that there is no basis in Texas law for applying the doctrine of regulatory estoppel, and, in fact, the doctrine has been rejected by courts applying Texas law. *See SnyderGeneral Corp. v. Great American Ins. Co.*, 928 F. Supp. 674, 682 (N.D. Tex. 1996), *aff'd sub nom. SnyderGeneral Corp. v. Continental Ins. Co.*, 133 F.3d 373 (5th Cir. 1998).

The district court in *SnyderGeneral* noted that, at the time, only one state had recognized the doctrine and every other state that considered it had rejected it. *Id.* When examining Texas law, the court held that, because of a recent Texas Supreme Court case wherein "[t]he court flatly rejected any attempt to rely on extrinsic evidence to create a latent ambiguity where the policy provision is clear on its face," the doctrine would not be well received in Texas. *Id.* The Court

agrees with the district court in *SnyderGeneral* and holds that Texas law does not allow for overlooking the text of unambiguous policy provisions under the doctrine of regulatory estoppel.

Finally, Plaintiff argues that a provision in the Virus Endorsement specifically includes coverage for viruses: Section B.1.f. *See* (Resp., Dkt. 42, at 8). This section allows for up to 30 days of coverage for business interruption if "loss or damage to property caused by . . . virus" causes a suspension of operations and if "Time Element Coverage applies." Plaintiff explains (and Defendant does not appear to argue) that "Time Element Coverage" is a term of art in the insurance industry referring to coverages measured in time, including Business Interruption and Civil Authority coverages. *See id.* Defendant argues that the Time Element Coverage only applies within the context of Form SS 40 93 07 05, which lists specified causes from which a covered virus must result. *See* (Mot., Dkt. 37, at 12). Defendant also responds that allowing independent recovery under Section B.1.f. would render the Virus Exclusion moot. *Id.*

The Court holds that Plaintiff has plead a plausible claim for relief pertaining to coverage under Section B.1.f. The text of the insurance policy does not limit Section B.1.f. to certain contributing causes (as found in Section B.1.a.). Therefore, the Court will deny the Motion to Dismiss Plaintiff's claims relating specifically to that section. However, the Court holds that the Virus Endorsement contains a valid exclusion clause that precludes recovery under sections other than Section B.1.f.

### d. Motion to Dismiss Class Action Claims

Plaintiff seeks to represent a nationwide class of Defendant's insureds. However, Defendant argues that allowing Plaintiff to do so would be inappropriate because Plaintiff is "a Texas company operating only in Texas, suing under a Texas insurance policy," and as such it lacks standing to assert claims on behalf of insureds in other states under the law of other states.

*See* (Mot., Dkt. 38, at 2). The parties dispute several factors related to this motion, including the procedural posture of the motion itself—Plaintiff argues the motion is properly considered a motion to strike class allegations under Rule 12(f) or a premature motion to deny class certification under Rule 23. *See* (Resp., Dkt. 41, at 2–3).

However, while the Court agrees that a plaintiff must "demonstrate standing for each claim he seeks to press,"[4] and that the fact that "a suit may be a class action . . . adds nothing to the question of standing,"[5] the Court agrees with Plaintiff that no standing issue exists here. Defendant has not challenged Plaintiff's standing to bring suit on *its own* behalf, and the Court does not foresee any reason such a challenge would be successful. Instead, Defendant challenges whether Plaintiff has standing "to bring contract claims under the laws of California, or Colorado, or Connecticut—or anywhere else." (Reply, Dkt. 45, at 1). As Plaintiff argues, "Rule 23, not Article III standing, is the better framework for analyzing differences between the named plaintiff and the absent class members."[6]

The Court will therefore deny Defendant's motion to dismiss the class action claims and will determine the question of class certification at the appropriate time.

### III.     CONCLUSION

---

[4] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).
[5] *Lewis v. Casey*, 518 U.S. 343, 357 (1996).
[6] *See* (Resp., Dkt. 41, at 5) (citing NEWBERG ON CLASS ACTIONS §2.6 (5th ed.)) ("*First*, while standing doctrine is primarily concerned with ensuring that a real case or controversy exists, Rule 23(a)'s requirements are designed precisely to address concerns about the relationship between the class representative and the class. Hence, Rule 23 is a more appropriate tool to utilize in accessing these problems. *Second*, this conclusion is bolstered by the fact that, unlike the abstract and often politicized nature of standing decisions, class certification focuses a court on pragmatic factors in a familiar and accessible manner. Finally, the class certification approach has the virtue of resolving disjuncture questions in a nonconstitutional manner and thus of avoiding unnecessary constitutional adjudication."); *see also Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 96 (2nd Cir. 2018) ("[W]e conclude that whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III," and explaining that the only other Circuit to consider the issue ruled the same way in the *Morrison* case); *Morrison v. YTB Intern, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (that "plaintiffs must rely on some other state's law . . . has nothing to do with standing, though it may affect whether a class should be certified.").

For the reasons explained herein, the Court enters the following orders:

**IT IS ORDERED** that Defendant's Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. 37) is **GRANTED IN PART** and **DENIED IN PART** in accordance with the reasoning herein.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss First Amended Complaint's Nationwide Class Action Claims (Dkt. 38) is **DENIED**.

SIGNED this 4th day of November, 2020.

JAMES R. NOWLIN
SENIOR U.S. DISTRICT JUDGE